U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI
FILED
NOV 13 2013
DANNY L. MILLER, CLERK
BY_____DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:   DORISIA MARIE BURNS, DEBTOR   CASE NO. 12-02824-NPO
CHAPTER 13

DORISIA MARIE BURNS                              PLAINTIFF

VS.                                              ADV. PROC. NO. 12-00101-NPO

HOME ZONE SALES AND                              DEFENDANT
LEASE PURCHASE, LLC

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW the Plaintiff, Dorisia Marie Burns, and proposes the following findings of fact and conclusions of law, to-wit:

*Proposed Findings of Fact*

1. The Plaintiff, Dorisia Marie Burns ("Burns"), filed a voluntary petition pursuant to 11 U.S.C. § 301 seeking relief under Chapter 13 of the Bankruptcy Code on August 31, 2012.

2. The Defendant, Home Zone Sales and Lease Purchase, LLC ("Home Zone"), is a creditor of Burns and scheduled as such in Burns' bankruptcy case.

3. On September 1, 2012, Home Zone employee Quinn Wright went to Burns' residence concerning the status of Burns' account with Home Zone. Quinn Wright threatened Burns with criminal prosecution if she failed to pay on her account or let him into her residence.

4. While at Burns' home on September 1, 2012, Quinn Wright spoke with Burns. During

that conversation, Burns told Quinn Wright that she (Burns) had filed a bankruptcy case. Additionally, Burns gave a Bond, Botes & Woods, P.C. business card to Quinn Wright and told Quinn Wright that Bond, Botes & Woods, P.C. were her bankruptcy attorneys.

5. On September 1, 2012, Quinn Wright left Burns' residence and went straight back to the Home Zone store where he showed the Bond, Botes & Woods, P. C. card to Home Zone General Manager William Willis.

6. At the time Quinn Wright showed the Bond, Botes & Woods, P. C. business card to William Willis, Quinn Wright told William Willis that Burns claimed to have filed a bankruptcy case and that William Willis should call the attorney for Ms. Burns.

7. Upon being informed of the foregoing, William Willis placed a telephone call to Burns; however, Quinn Wright walked away and did not hear any of the conversation that ensued.

8. After his interaction with Burns on September 1, 2012, Quinn Wright had no further contact or communication of any kind with Burns.

9. Between September 1, 2012 and September 4, 2012, Home Zone continued to call and attempt to contact Burns about the status of her account with Home Zone.

10. On the morning of September 4, 2012, Burns and William Willis spoke by telephone. During this call, Burns told William Willis that she had filed a bankruptcy case and suggested that William Willis contact her lawyers to verify her case filing.

11. During this call, William Willis told Burns that her bankruptcy case filing was fraudulent and that she would lose everything.

12. Shortly after the above referenced telephone conversation, Burns called her attorneys'

office and obtained her bankruptcy case number. She called Home Zone back and provided this number to Home Zone.

13. During the afternoon of September 4, 2012, William Willis went to Burns' home at 1009 Davis Street, Yazoo City, Mississippi. He was alone when he arrived at Burns' home.

14. When William Willis arrived at Burns' home on the afternoon of September 4, 2012, he first saw Burns' fifteen year old son, KaDarius Burns, sitting out on the front porch of the residence.

15. Burns was not home when William Willis first arrived there.

16. William Willis told KaDarius Burns that he (William Willis) had a "court order" to pick up a refrigerator and furniture; however, he would not show the "court order" to KaDarius Burns.

17. There was never any order of any court authorizing or directing Home Zone to recover any property from the Burns' residence.

18. While outside the home standing on the steps, William Willis placed a telephone call to another party telling that party to "call the police". The other party is believed to have been Quinn Wright. No law enforcement officers or personnel ever appeared.

19. Before William Willis entered the home, KaDarius Burns told William Willis that Burns was not home and that William Willis should wait until Burns returned home.

20. William Willis ignored KaDarius Burns and entered the residence by shoving KaDarius Burns aside.

21. Burns' elderly mother, Doris Braxton, was just inside the residence when William Willis entered.

22. William Willis stated to Doris Braxton that he was going to remove furniture from the home.

23. William Willis did not ask for permission to enter the residence.

24. Doris Braxton did not give William Willis permission to enter the residence.

25. Immediately after entering the residence, William Willis began disassembling the bedroom furniture and instructed KaDarius Burns to remove clothing and other items from and around the furniture.

26. As William Willis was beginning to disassemble the bedroom furniture, KaDarius Burns called Burns on the telephone and advised Burns that William Willis was present.

27. William Willis' actions caused KaDarius Burns to become extremely agitated.

28. KaDarius Burns threw clothing items around the house.

29. KaDarius Burns went outside the residence and hit a tool shed behind the home with his elbow cutting it and causing it to bleed.

30. William Willis asked KaDarius Burns if he (KaDarius Burns) was okay but KaDarius Burns ignored him.

31. KaDarius Burns has a history of seizures triggered by stress.

32. KaDarius Burns believes that he suffered a seizure as a result of Home Zone's actions on September 4, 2012.

33. Dorisia Burns arrived a short period of time after KaDarius Burns called and told her that William Willis was present and beginning to remove furniture.

34. William Willis called Home Zone employees Morris Williams and Gerald McCullough to assist him in recovering furniture from Burns' home.

35. Morris Williams and Gerald McCullough assisted William Willis with the removal of the furniture and refrigerator from Burns' home on September 4, 2012.

34. Burns was able to calm KaDarius Burns when she arrived at her home.

35. Burns arrived while the Home Zone employees were removing furniture and Burns told William Willis that she had filed a bankruptcy case and repeatedly asked William Willis to leave her home; however, he refused to leave.

36. While William Willis and the other Home Zone employees were present and removing furniture from her home, Burns called her attorneys' office to advised counsel of Home Zone's actions.

37. During the above referenced telephone call, Burns' counsel spoke to William Willis warned William Willis to discontinue the repossession efforts because Burns was protected by the automatic stay arising from her bankruptcy case.

38. William Willis ignored the warnings of Burns' counsel and continued with the repossession.

39. William Willis was present in Burns' home for approximately 2 ½ hours.

40. The Home Zone employees removed: (1) a bed, including headboard, footboard, and rails; (2) mattress set; (3) night stand; (4) dresser and mirror; and (5) a refrigerator from Burns' home on September 4, 2012.

41. Because of the removal of the refrigerator, some food spoiled.

42. William Willis knew that he was not supposed to take any collection action against a customer who was in a bankruptcy case.

43. As a result of Home Zone's actions on September 4, 2012, Burns and members of her

family has suffered emotional harm including: (1) exacerbation of existing hypertension, anxiety, and angina; (2) anxiety, stress and mental anguish over the effect of the repossession in the children; (3) loss of appetite; (4) crying; (5) sleepless nights; (6) blood pressure fluctuations; and (7) feelings of being violated.

44. As a result of Home Zone's actions on September 4, 2012, Burns and members of her family have suffered and continue to suffer from the loss of use of the furniture taken although she has attempted and been partially successful at replacing some of the lost furniture.

45. As a result of Home Zone's actions on September 4, 2012, Burns and members of her family have suffered spoilage of food.

46. As a result of Home Zone's actions on September 4, 2012, Burns has incurred reasonable and necessary attorneys fees.

47. As a result of Home Zone's actions on September 4, 2012, Burns has incurred reasonable and necessary expenses.

48. The actions of Home Zone on September 4, 2012 were willful, egregious, and taken in reckless disregard for Burns' rights.

### *Proposed Conclusions of Law*

1. Home Zone had actual, prior knowledge of the automatic stay in Burns' bankruptcy case prior to September 4, 2012.

2. Home Zone acted intentionally towards Burns and her property by attempting to collect from Burns on September 1, 2012 and culminating with the removal of furniture and a refrigerator from Burns' home on September 4, 2012.

3. The actions of Home Zone between September 1, 2012 and culminating with removal of property from Burns' home on September 4, 2012 violated the automatic stay arising from Burns' bankruptcy case.

4. Burns has suffered actual and compensable damages in the form of emotional injury, anxiety and distress and should awarded the sum of $4,000.00 as actual damages.

5. Burns has suffered actual and compensable damages in the form of loss of use of property and should be awarded the sum of $1,770.00 as actual damages.

6. Burns has suffered actual and compensable damages in the form of loss of use of property due to food spoilage and should be awarded the sum of $484.00 as actual damages.

7. The Plaintiff has suffered actual and compensable damages in the form of reasonable and necessary attorneys fees and should be awarded the sum of $39,420.00 through November 11, 2013 plus accruing as actual damages.

8. Burns has suffered actual and compensable damages in the form of reasonable and necessary litigation expenses and should be awarded the sum of $2,157.85 as actual damages.

9. The conduct of Home Zone taken against Burns after Home Zone knew of the Burns' pending bankruptcy case was egregious and in reckless disregard for the rights of Burns.

10. The conduct of Home Zone taken against Burns after the Home Zone knew of Burns' pending bankruptcy case was in contempt of this court.

11. Burns is entitled to an award of punitive damages in the sum of $35,000.00 and against Home Zone deter similar conduct by the Home Zone in the future.

12. Home Zone's knowing violations of the automatic stay in this case are the actual and

proximate cause of the Burns' damages.

Respectfully submitted,

DORISIA MARIE BURNS

By: _____
   EDWIN WOODS, JR. (MB# 8893)

OF COUNSEL:

BOND BOTES & WOODS, P.C.
130 Southpointe Drive, Suite D
Byram, Mississippi 39272
O: (601) 353-5000
F: (601) 372-7140