**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:

    **DORISIA MARIE BURNS,**                         **CASE NO. 12-02824-NPO**

    **DEBTOR.**                                       **CHAPTER 13**

**DORISIA MARIE BURNS**                                 **PLAINTIFF**

**VS.**                                 **ADV. PROC. NO. 12-00101-NPO**

**HOME ZONE SALES AND**
**LEASE PURCHASE, LLC**                                 **DEFENDANT**

**MEMORANDUM OPINION AND ORDER ON COMPLAINT**
**SEEKING DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY**

This matter came before the Court at trial on November 12-13, 2013 (the "Trial"), on the

Complaint Seeking Damages for Violation the Automatic Stay (Adv. Dkt. 1)[1] filed by Dorisia

Marie Burns (the "Debtor") and the Defendant's Answer and Affirmative Defenses to Plaintiff's

Complaint Seeking Damages For Violation of the Automatic Stay (Adv. Dkt. 14) filed by Home

Zone Sales & Lease Purchase, LLC ("Home Zone") in the Adversary. The Pretrial Order (the

"Pretrial Order") (Adv. Dkt. 45) was entered on November 4, 2013.

At Trial, Edwin Woods, Jr. ("Woods"), with the law firm of Bond Botes & Woods, P.C.

("Bond Botes & Woods"), represented the Debtor, and Ashley H. Hendren ("Hendren")

represented Home Zone. During Trial, the Debtor and Home Zone introduced into evidence

eleven (11) joint exhibits, the Debtor introduced into evidence seven (7) exhibits, and Home

---

[1] Citations to the record are as follows: (1) citations to docket entries in the above-styled adversary proceeding (the "Adversary") are cited as "(Adv. Dkt. ____)"; and (2) citations to docket entries in the main bankruptcy case, Case No. 12-02824-NPO, are cited as "(Bankr. Dkt. ____)".

Zone introduced into evidence eleven (11) exhibits.[2]   In addition to her own testimony, the Debtor presented the testimony of seven (7) witnesses: (a) William Willis ("Willis"), the former general manager of Home Zone; (b) Quinn Wright ("Wright"), a current employee of Home Zone; (c) Morris Williams ("Williams"), the current general manager of Home Zone; (d) KaDarius Burns ("KaDarius"), the Debtor's son; (e) KaNiesha Burns ("KaNiesha"), the Debtor's daughter; (f) Cary McPhearson ("McPhearson"), the co-owner and president of Home Zone; and (g) Woods. Home Zone, in its case-in-chief, presented the testimony of three (3) witnesses: (a) Willis; (b) McPhearson; and (c) Joshua C. Lawhorn, Esq. ("Lawhorn"), an associate attorney at Bond Botes & Woods. At issue in the Adversary is whether Home Zone violated the automatic stay under 11 U.S.C. § 362(a),[3] and, if so, whether the Debtor is entitled to damages under § 362(k). The Court, having considered the pleadings, evidence, and arguments of counsel, finds the Debtor has successfully demonstrated that Home Zone willfully violated the automatic stay and is entitled to damages in the amount of $35,711.78 for the reasons set forth below.[4]

---

[2] Hereinafter, joint exhibits introduced into evidence at Trial by the Debtor and Home Zone are cited as "(Joint Ex. ___)", exhibits introduced into evidence at Trial by the Debtor are cited as "(Debtor Ex. ___)", and exhibits introduced into evidence at Trial by Home Zone are cited as "(Home Zone Ex. ___)".

[3] Hereinafter, all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code, unless otherwise noted.

[4] Pursuant to Federal Rule of Civil Procedure 52, as made applicable to this Adversary by Federal Rule of Bankruptcy Procedure 7052, the following constitutes the findings of fact and conclusions of law of the Court.

**Jurisdiction**

This Court has jurisdiction over the parties to and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). Notice of the Trial was proper under the circumstances.

**Facts**

1.     On December 3, 2011, the Debtor entered into a lease purchase agreement (the "Agreement") (Joint Ex. 9) with Home Zone.

2.     On August 31, 2012, the Debtor voluntarily filed a petition for relief under chapter 13 of the U.S. Bankruptcy Code. (Bankr. Dkt. 1).

3.     On September 1, 2012, the Debtor received two telephone calls from Home Zone employees regarding the Debtor's account, which had become delinquent.[5] Later that day, Wright visited the Debtor at her residence[6] regarding the account. In response, the Debtor gave Wright a Bond Botes & Woods business card, informed him that she had filed bankruptcy, and told him to call the telephone number on the card if he had any questions.[7] After Wright left the Debtor's residence, he returned to the Home Zone location in Yazoo City, Mississippi and showed the business card to Willis.[8] What Wright told Willis when he showed Willis the

---

[5] 1 Test. of Debtor at 2:59:20 – 2:59:30. The Trial was not transcribed. References to the testimony presented at Trial are cited by the timestamp of the audio recording. References to testimony that was given on the first day of Trial on November 12 are cited as "(1  Test. of ___ at ___)", references to testimony that was given on the second day of Trial on November 13 are cited as "(2 Test. of ___ at ___)".

[6] The property is located in Yazoo City, Mississippi. The house is owned by the Debtor's mother, Doris Braxton ("Braxton"). *Id.* at 4:03:25 – 4:03:33. The Debtor, KaDarius, KaNiesha, and Braxton live together in the house. *Id.* at 2:50:30 – 2:50:45.

[7] 1 Test. of Wright at 1:34:15 – 1:34:28.

[8] *Id.* at 1:34:38 – 1:34:53.

business card is disputed. Wright testified that he told Willis that the Debtor had communicated to him that she had already filed bankruptcy.[9] Willis, on the other hand, testified that Wright told him that the Debtor told Wright that she was going to file bankruptcy.[10] In assessing the truthfulness and accuracy of Willis's and Wright's testimony, the Court has determined Wright's testimony to be more credible and that Wright's recitation that he told Willis the Debtor already had filed bankruptcy is factual. After Willis was shown the business card, he told Wright to file the card away.

4.      At Trial, the Debtor testified that during the morning of September 4, 2012, she received a telephone call from Willis regarding her delinquent account.[11] Willis testified that he did not have a telephone conversation with the Debtor that morning.[12] In assessing the truthfulness and accuracy of the Debtor's and Willis's testimony, the Court has determined the Debtor's testimony to be more credible and that her recitation that Willis called her on the morning of September 4, 2012, is factual. Following her conversation with Willis, the Debtor testified that she ignored "two or three" additional telephone calls from Home Zone.[13] Later that afternoon, Willis went to the Debtor's residence to "try to clear two accounts" that were delinquent.[14] The first account belonged to the Debtor and was associated with the following

---

[9] *Id.* at 1:34:54 – 1:35:12.

[10] 1 Test. of Willis at 10:24:30 – 10:24:45.

[11] 1 Test. of Debtor at 3:00:38 – 3:01:05.

[12] 1 Test. of Willis at 10:30:46 - 10:31:48.

[13] 1 Test. of Debtor at 3:02:15 – 3:02:40. The Debtor testified that she knew the calls were from Home Zone because "it was on the little Caller I.D." *Id.* at 3:02:43 – 3:02:50.

[14] 1. Test. of Willis at 10:32:45 – 10:33:18.

items: (a) bed including a headboard, footboard, and rails; (b) night stand; (c) dresser and mirror; and (d) mattress set (collectively, the "Bedroom Set"). The second account belonged to Wanda Griffin ("Griffin"), the Debtor's sister, and was associated with a refrigerator (the "Refrigerator") that was located in the Debtor's residence.

5.    The Debtor, however, was not home when Willis arrived during the afternoon of September 4, 2012. Instead, Willis spoke with KaDarius and Braxton, who were at the residence. Willis eventually called two other Home Zone employees, Williams and Gerald McCullough ("McCullough"), to come to the Debtor's residence and assist with the repossession of the collateral associated with the two delinquent accounts.

6.    While Willis was at the Debtor's residence, KaDarius telephoned the Debtor, who was en route to pick up KaNiesha from school. By the time the Debtor returned to the residence, Willis, Williams, and McCullough had loaded the Bedroom Set onto a Home Zone truck. The Refrigerator had not yet been removed fully from the home.

7.    When the Debtor arrived at the residence, she was on the telephone with Woods. When she got out of her vehicle, she handed the telephone to Willis, and Woods provided Willis with the date and case number of the Debtor's bankruptcy filing.[15] Willis testified that he told Woods he had not received any official paperwork or contact regarding the Debtor's bankruptcy, but that he would return the Bedroom Set if it turned out that the Debtor had filed bankruptcy.[16] Woods also told Willis that if he continued to remove the Refrigerator from the home, it would be a violation of the law because of the Debtor's bankruptcy case.[17] Willis responded that he

---

[15] 1 Test. of Willis at 10:45:45 – 10:46:00.

[16] *Id.* at 10:46:10 – 10:46:25.

[17] *Id.* at 10:46:40 – 10:46:55.

could repossess the Refrigerator because it was associated with Griffin's account, not the Debtor's account.

8.    Willis then had the Debtor remove the contents of the Refrigerator. Once the contents of the Refrigerator were removed, Willis, Williams, and McCullough loaded the appliance onto the Home Zone truck and left the residence with the Refrigerator and Bedroom Set.

9.    Later that day, after Willis returned to the Home Zone location in Yazoo City, Mississippi, he received a facsimile from Bond Botes & Woods confirming that the Debtor had a pending bankruptcy case. After September 4, 2012, neither Willis nor any other Home Zone employee contacted the Debtor or returned the Refrigerator or Bedroom Set to the Debtor's residence.

## Discussion

### A.  Willful Violation of the Automatic Stay

"When a bankruptcy petition is filed, an automatic stay operates as a self-executing injunction" that prevents creditors from pursuing collection efforts against the debtor or the property of the debtor's estate for pre-petition debts. *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 354-55 (5th Cir. 2008). The purpose behind the automatic stay in § 362(a) is to allow a debtor a "breathing spell" and a chance for a fresh start. *Templeton Mortg. Corp. v. Chesnut (In re Chesnut)*, 422 F.3d 298, 301 (5th Cir. 2005) (quotation omitted). Should the automatic stay be violated, Congress has provided a debtor with a private right of action for any "willful violation." *Campbell*, 545 F.3d at 355. Section 362(k) provides, in pertinent part: "[A]n individual injured by any willful violation of a stay provided by this section shall recover actual

damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k).

Specific intent to violate the automatic stay is not required to prove the willfulness of a creditor's violation. *Campbell*, 545 F.3d at 355. Instead, the Fifth Circuit Court of Appeals has established a three-part test for establishing an actionable violation of the stay under § 362(k): (1) the creditor must have known of the existence of the stay, (2) the creditor's acts must have been intentional, and (3) the creditor's acts must have violated the stay. *Young v. Repine (In re Repine)*, 536 F.3d 512, 519 (5th Cir. 2008). Here, the Debtor alleges that Home Zone knew she had filed a bankruptcy case and willfully violated the stay by intentionally engaging in the following acts: (1) repeatedly calling her in an attempt to collect the debt, (2) appearing at her home in an attempt to collect the debt, and (3) repossessing the Bedroom Set and Refrigerator.

In *Johnson v. Magee* Rentals, *Inc.*, 478 B.R. 235 (Bankr. S.D. Miss. 2012), this Court held that oral notice of the filing of a bankruptcy petition is sufficient to satisfy the "knowledge" element of § 362(k). On September 1, 2012, the Debtor handed Wright a Bond Botes & Woods business card and told him that she had filed bankruptcy. Wright then gave the card to Willis and communicated to him that the Debtor had told him that she had already filed bankruptcy. Despite the Debtor's communication to a Home Zone employee about her bankruptcy filing, she received at least three (3) phone calls from Home Zone employees on September 4, 2012 regarding her account. Later that day, Willis went to her home to "try to clear two accounts." Eventually, other Home Zone employees came to her residence and repossessed the Bedroom Set and Refrigerator. It is clear from these facts that Home Zone had knowledge of the filing of the Debtor's bankruptcy petition and that Home Zone's acts of calling the Debtor in an attempt to collect the debt, appearing at the Debtor's residence in an attempt to collect the debt, and repossessing the

collateral were intentional. Therefore, the first two elements of the three-part test set forth by the Fifth Circuit are satisfied in respect to both the Bedroom Set and the Refrigerator.

Regarding the third part of the test, Home Zone does not dispute it violated the automatic stay by repossessing the Bedroom Set. Therefore, the three-part test is satisfied fully in respect to the repossession of the Bedroom Set. Home Zone, however, does dispute that a violation of the automatic stay occurred when it repossessed the Refrigerator. According to Home Zone, the automatic stay did not extend to the Refrigerator because the Refrigerator was not included in any lease purchase agreement between Home Zone and the Debtor. The automatic stay, however, has a broad scope. *See In re Chesnut*, 422 F.3d at 303, 8 COLLIER ON BANKRUPTCY § 362.03 (16th ed. 2013) (noting the stay's "extremely broad" scope). Courts have found that a mere possessory interest is sufficient to invoke the protection of the automatic stay. *See 48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427 (2d Cir. 1987); *Cuffee v. Atl. Bus. & Cmty. Dev. Corp. (In re Atl. Bus. & Cmty. Corp.)*, 901 F.2d 325 (3rd Cir. 1990); *Convenient Food Mart No. 144, Inc. v. Convenient Indus. of Am., Inc. (In re Convenient Food Mart No. 144, Inc.)*, 968 F.2d 592, 594 (6th Cir. 1992). In this case, the Court finds that the Debtor had a possessory interest in the Refrigerator. The Refrigerator was located in the Debtor's residence at the direction of Griffin.[18] The Refrigerator contained food mostly purchased by the Debtor. Finally, the Debtor periodically made the payments associated with the Refrigerator.[19] For these reasons, the Court finds that the Debtor had a possessory interest in the Refrigerator, and as a result, it is included within the scope of the automatic stay. Because the automatic stay extended to the Refrigerator, Home Zone's repossession of the appliance

---

[18] 1 Test. of Debtor at 3:36:34 – 3:36:57.

[19] *Id.* at 3:36:34 – 3:37:03.

constituted a violation of the stay, thereby satisfying the third element of the three-part test for a willful violation of the automatic stay.

In summary, the Court finds that the three-part test established by the Fifth Circuit is satisfied regarding both the Bedroom Set and Refrigerator. Home Zone received oral notice of the Debtor's bankruptcy filing on September 1, 2012. Home Zone's multiple phone calls to the Debtor on September 4, 2012, Home Zone's appearance at the Debtor's residence on the afternoon of September 4, 2012, and Home Zone's repossession of the Bedroom Set and Refrigerator were all attempts to collect a debt, and as a result, violated the automatic stay. Consequently, the Court finds that the Debtor has successfully demonstrated that Home Zone willfully violated the automatic stay, entitling the Debtor to damages.

## B.  Damages for Willful Violation of the Automatic Stay

A debtor who can successfully prove all three elements of a willful violation of the automatic stay may recover actual damages, including attorney's fees, and, if appropriate, punitive damages. *See* 11 U.S.C. § 362(k). Damages under § 362(k) "must be proven with reasonable certainty and may not be speculative or based on conjecture." *Clayton v. Old Kent Mortg. Co. (In re Clayton)*, No. 09-03024, 2010 WL 4482810, at *2 (Bankr. S.D. Tex. Oct. 29, 2010) (quotation omitted). In addition, courts have developed a special rule requiring that a moving party mitigate damages in actions brought under § 362(k). *Tracy v. Bank of Am., N.A. (In re Tracy)*, No. 08-5125, 2010 WL 5462490, at *1 (Bankr. W.D. Tex. Dec. 29, 2010) (citation omitted). The Court will consider the amount of all of the Debtor's damages and will address the mitigation issue separately.

1.     **Debtor's Actual Damages**

At Trial, the Debtor claimed she is entitled to actual damages for (1) emotional injury, (2) loss of property, and (3) attorneys' fees, costs, and expenses. The Court will address each category of damages in turn.

a.  **Emotional Injury**

In the Pretrial Order, the Debtor requested "[n]ot less than $4,000.00" in emotional distress damages. The Fifth Circuit has not yet decided the standard of proof necessary for a debtor to recover damages for an emotional distress claim under § 362(k). *Repine*, 536 F.3d at 521. The Fifth Circuit has cautioned, however, that a debtor must provide, at a minimum, "specific information" regarding the damages caused by the emotional injury. *Id.* at 521-22. "[H]urt feelings, anger and frustration are part of life, and are not the types of emotional harm that could support an award of damages." *Collier v. Hill (In re Collier)*, 410 B.R. 464, 477 (Bankr. S.D. Tex. 2009) (citation omitted). A debtor is entitled to damages only if she can show a "specific discernable injury to [her] emotional state, proven with evidence regarding the nature and extent of the harm." *Id.* Corroborating evidence of emotional distress from a spouse or close friend is not required —"but only if the testimony [of a debtor] is particularized and extensive enough to meet the specificity requirement." *Id.* In addition, there must be a reasonable relationship between the willful violation and the emotional injury. *Clayton*, 2010 WL 4482810, at *3.

At Trial, the Debtor testified that after the repossession on September 4, 2012, KaNiesha and herself had to sleep on the floor. Because of the Debtor's new sleeping arrangements, she had several personal and health issues, including trouble eating, anxiety attacks, and several sleepless nights. She attributed her anxiety attacks to the feeling that she let her family down, the

fear of bugs crawling over her children while they slept on the floor,[20] and the embarrassment she felt on September 4, 2012 when her neighbors observed the repossession and made derogatory comments toward her while the Home Zone employees loaded the Bedroom Set and Refrigerator onto a Home Zone truck.[21] The Debtor also testified that since September 4, 2012, she has suffered from crying episodes "2 to 3 times a week" because of the repossession.[22] The Debtor stated that her overall temperament following the repossession was dramatically different than her normal "happy-go-lucky" attitude.[23] The Court finds that the testimony of the Debtor meets the specificity requirement and evidences a reasonable relationship between the Debtor's emotional injuries and Home Zone's violation of the automatic stay.

Although the Debtor has shown she is entitled to emotional damages, the Court finds that the issues described by the Debtor do not warrant damages of $4,000.00, the amount sought by the Debtor. In consideration of all the circumstances, and the amount of awards granted in similar litigation, the Court finds that the Debtor has shown emotional distress damages of $1,500.00. *Cf. Collier*, 410 B.R. at 477 (finding that a debtor was entitled to $1,500.00 for emotional damages stemming from headaches and a change of temperament caused by a willful violation of the automatic stay).

### b.  Loss of Property

In the Pretrial Order, the Debtor requested "[n]ot less than $2,254.00" in loss of property damages relating to the loss of the Bedroom Set and some groceries that had spoiled after they

---

[20] *Id.* at 3:39:00 – 3:39:42.

[21] *Id.* at 3:46:30 – 3:47:08.

[22] *Id.* at 3:41:50 – 3:42:05.

[23] *Id.* at 3:40:28 – 3:40:53.

were removed from the Refrigerator during the repossession. The Court will consider the loss of

property damages for the Bedroom Set and groceries separately.[24]

### i. Bedroom Set

The Bedroom Set was repossessed by Home Zone on September 4, 2012. Because of the

wrongful repossession, the Debtor is entitled to the value of the use of the Bedroom Set for the

period of time between the day the property was repossessed and the day the Debtor found a

substitute for the property. *See* RESTATEMENT (SECOND) OF TORTS § 931.

At Trial, the Debtor testified she had obtained replacements for all of the Bedroom Set,

except the mattress set, "a week or two before October."[25] She then leased a new mattress set

once she could afford to do so, which was sometime around "November or December."[26]

Because the Debtor did not provide the exact dates she received the replacement furniture, the

Court will consider, for the purpose of calculating damages, the replacement dates to be the

median date for each time frame the Debtor was able to provide: September 24, 2012 for most of

the Bedroom Set and November 30, 2012 for the mattress set.

At Trial, the Debtor and Home Zone jointly submitted a "CLOSED TICKET INQUIRY"

(the "Inquiry") (Joint Ex. 7) that provided the rates of the rental payments for the Bedroom Set.

After reviewing both the Inquiry and the Agreement, the Court has determined that at the time of

---

[24] While the Debtor requested damages for the loss of the groceries that were located within the Refrigerator, she did not ask for damages relating to the loss of the Refrigerator itself in either the Pretrial Order or at Trial. Additionally, the Debtor did not put forth sufficient evidence for this purpose. The Court, therefore, will not address damages resulting from the loss of the Refrigerator individually. See section 1. b. ii for the Court's discussion on the requested damages for the loss of the groceries.

[25] 1 Test. of Debtor at 4:11:24 – 4:12:09.

[26] *Id.* at 4:12:09 – 4:12:25.

the repossession, the Debtor was paying a monthly rate of $162.62, including tax, for the

Bedroom Set. Of the $162.62, approximately $59.91 was for the mattress set. The remaining

$102.71 was for the other items included in the Bedroom Set. In light of these figures and the

period of time before the Debtor could replace the Bedroom Set, the Court determines that the

Debtor is entitled to $172.82 in damages relating to the loss of the mattress set for approximately

twelve and a half weeks and $71.11 in damages relating to the loss of the rest of the Bedroom Set

for approximately three weeks. In sum, the Court determines that Debtor is entitled to a total of

$243.93 in damages relating to the loss of the Bedroom Set.

### ii.  Groceries

At Trial, the Debtor testified in great detail as to the contents of the Refrigerator as of

September 4, 2012, specifically which items spoiled and which items she was able to salvage.

The Debtor valued the food that spoiled at $300.00.[27] The Court finds this amount to be

reasonable and that the Debtor is entitled to $300.00 for food that was lost because of Home

Zone's repossession of the Refrigerator.

### c.  Attorneys' Fees, Costs, and Expenses

A debtor may recover reasonable attorney's fees and expenses incurred in prosecuting a

§ 362(k) action. *Repine*, 536 F.3d at 522. The Debtor seeks recovery of attorney's fees and

expenses billed by Woods and Lawhorn in the amount of $41,577.85 that was incurred from

September 4, 2012 to November 11, 2013. (Debtor Ex. 6). In addition, the Debtor requests

---

[27] *Id.* at 3:28:43 – 3:29:40.

attorney's fees totaling $3,270.00[28] for the time spent at Trial. The Debtor bears the burden of

proving the reasonableness of these fees.

In order to determine whether the fees set forth in the Statement for Professional Services

Rendered (the "Statement") are reasonable, this Court employs the "lodestar" method, which

requires the Court to multiply the prevailing hourly rate in the community by the number of

hours that an attorney would reasonably expend prosecuting the Adversary. *Walker & Peterson,*

*P.C. v. Cahill (In re Cahill)*, 428 F.3d 536, 540 (5th Cir. 2005). After calculating the "lodestar"

fee, the Court considers whether to adjust that fee upwards or downwards based upon the twelve

factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974),

*overruled on other grounds* by *Blanchard v. Bergeron*, 489 U.S. 87 (1989). The *Johnson* factors

are:

> (1) the time and labor required, (2) the novelty and difficulty of the questions, (3)
> the skill requisite to perform the legal service properly, (4) the preclusion of other
> employment by the attorney due to acceptance of the case, (5) the customary fee,
> (6) whether the fee is fixed or contingent, (7) time limitations imposed by the
> client or the circumstances, (8) the amount involved and the results obtained, (9)
> the experience, reputation, and ability of the attorneys, (10) the "undesirability" of
> the case, (11) the nature and length of the professional relationship with the client,
> and (12) awards in similar cases.

*Johnson*, 488 F.2d at 717-19.

In this case, the Statement reflects that between September 4, 2012 and November 11,

2013, the Debtor was charged an hourly billing rate of $300.00 for the 129.8 hours of work

completed by Woods (totaling $38,940.00) and $150.00 for the 3.2 hours of work completed by

Lawhorn (totaling $480.00). The Statement also includes an itemization of expenses totaling

$2,157.85. In addition, Woods testified at trial that he would charge an hourly billing rate of

---

[28] This amount was calculated by multiplying the approximate duration of the trial (10.9
hours) by Woods's hourly billing rate ($300.00).

$300.00 for the approximate 10.9 hours spent at Trial. As a result, Woods is seeking $42,690.00 for attorney's fees and $2,157.85 for expenses, for a total of $44,847.85.

"[P]laintiffs are charged with the burden of showing the reasonableness of the hours they bill and, accordingly, are charged with proving that they exercised billing judgment." *Walker v. U.S. Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 769 (5th Cir. 1996) (citation omitted). "Billing judgment requires documentation of the hours charged and the hours written off as unproductive, excessive, or redundant." *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006). If evidence of billing judgment is not provided, a fee award should be reduced accordingly "by a percentage intended to substitute for the exercise of billing judgment." *Id.*

At Trial, Home Zone argued the majority of the time entries on the Statement were unreasonable in light of the services performed. The crux of several of Home Zone's objections to the reasonableness of the fees focused on the factual and legal similarities between the present case and a previous case before this Court, *Johnson v. Magee Rentals, Inc.*, 478 B.R. 235 (Bankr. S.D. Miss. 2012), in which Woods was counsel for the debtor. Woods conceded that "a lot of the documents that I prepared in this [Adversary] were templates from the *Magee Rentals* case to save time,"[29] but testified that in his 22 years of being a licensed attorney, he has never inflated a client's bill, and that the Statement in the present case is completely accurate.

After considering Home Zone's objections and performing an exhaustive review of the Statement, the Court finds that Woods did not exercise proper billing judgment with respect to his pretrial billing entries. To begin with, there were billing entries totaling 8.0 hours for drafting a complaint and discovery requests. At Trial, Hendren noted that said complaint and discovery questions totaled 21 pages and that one of the documents mistakenly contained the words

---

[29] 2 Test. of Woods at 12:24:21 – 12:24:59.

"Magee Rentals," which shows the extent to which Woods utilized the pleadings from *Magee Rentals* as templates in the present case. Furthermore, Woods billed 10.4 hours for preparing discovery responses, 5.5 hours for reviewing Home Zone's discovery responses and drafting a deficiency letter, and 19.2 hours for deposition preparations. In accordance with this finding, the Court reduces these entries by fifty (50) percent "to substitute for the exercise of billing judgment." *See Saizan*, 448 F.3d at 799. As a result, the "lodestar" amount is reduced by $6,465.00.

In addition, Woods engaged in "block billing." "Block billing" is a "time-keeping method by which an attorney lumps together the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Harris v. Allstate Ins. Co.*, No. 07-8789, 2009 WL 86673, at *3 (E.D. La. Jan. 19, 2012) (collecting cases). The act of "block billing" impedes a court's ability to determine the reasonableness of the hours spent on individual tasks and has served as the basis for courts to issue a flat reduction of a specific percentage from an award of attorney's fees. *Id.* After an exhaustive review of the Statement, the Court finds that Woods clearly engaged in "block billing" on numerous entries. For example, the 6.6-hour billing entry for October 30, 2013 has the following description:

> Reviewing Home Zone's proposed list of exhibits to pre-trial order; Reviewing billing sheet of plaintiff; Review Defendant's pre-trial order; Continue review of pre-trial of Defendant's pre-trial order; Correspondence w/ counsel opposite re: order & exhibits; T/c w/ Ms. Hendren re: settlement & pre-trial exhibits; After-hours t/c Ms. Hendren re: proposed stipulations and preparing amended stipulations; Email proposed amended stipulations to Ms. Hendren.

(Debtor Ex. 6). In sum, entries that contained "block billing" totaled 48.1 hours. Due to the inordinate occurrences of "block billing," the Court is not able to determine fully the reasonableness of these billing entries. As a result, the Court will decrease Woods's fees for

these specific entries by fifty (50) percent. Therefore, the "lodestar" amount is reduced further by $7,215.00.

Pursuant to these findings, the Court decreases the "lodestar" amount by reducing Woods's pretrial fees ($38,940.00) by a total of $13,680.00, which equals $25,260.00. The Court does conclude that Lawhorn exercised adequate billing judgment and that Lawhorn's and Woods's individual hourly billing rates are reasonable. In addition, the Court finds the $3,270.00 billed at Trial is likewise reasonable. As a result of adding Lawhorn's fees ($480.00) and the fees billed at Trial ($3,270.00) to the adjusted amount of Woods's pretrial fees ($25,260.00), the "lodestar" amount is $29,010.00.

This Court has within its discretion to modify the "lodestar" fee based upon the twelve *Johnson* factors. *See CRG Partners Grp., LLC v. Neary (In re Pilgrim's Pride Corp.)*, 690 F.3d 650, 652 (5th Cir. 2012) (holding that U.S. Supreme Court's decision in *Perdue v. Kenny A. el rel Winn*, 559 U.S. 542 (2010), did not overrule framework applying *Johnson* factors). In support of his attorney's fees, Woods stated at Trial that the total amount of the fees was due mostly to the first *Johnson* factor: the time and labor required. Woods also testified about two other *Johnson* factors, stating that no legal aspect of the Adversary was novel and that his representation of the Debtor had no impact on his ability to accept other cases.

There is a strong presumption that the calculated "lodestar" amount is a reasonable fee. *Saizan*, 448 F.3d at 800. The Court finds there has not been specific evidence provided that shows this is one of the exceptional cases where an adjustment to the "lodestar" fee is appropriate. Therefore, the Court finds the calculated "lodestar" amount of $29,010.00 is reasonable, fair, and appropriate. In addition, the Court finds that the $2,157.85 listed as

expenses in the Statement is likewise reasonable. Therefore, the Debtor is entitled to a total of $31,167.85 for attorneys' fees and expenses.

2.      **Mitigation of Debtor's Actual Damages**

Having determined that the Debtor incurred actual damages in the total amount of $33,211.78,[30] the Court next considers whether the Debtor made reasonable efforts to mitigate those damages. This analysis is necessary to determine whether the Debtor's damages were reasonably incurred as a result of the stay violation by Home Zone. *Eskanos & Adler, P.C. v. Roman (In re Roman)*, 283 B.R. 1, 11 (9th Cir. B.A.P. 2002).

The Court finds the Debtor took every opportunity possible to mitigate her actual damages. After the repossession, the Debtor sought and replaced the Bedroom Set as soon as reasonably possible. Home Zone argues that after the repossession, it offered to give the furniture back to the Debtor. In particular, Willis testified that on September 4, 2012, after he received the facsimile from Bond Botes & Woods, he called the Debtor and offered to return the Bedroom Set.[31] The Debtor, however, testified that she never received such an offer from Willis or any other Home Zone employee.[32] The Debtor stressed that if anyone had offered to return any of the repossessed furniture, she would have accepted the furniture immediately. In assessing the truthfulness and accuracy of the Debtor's and Willis's testimony, the Court has determined the Debtor's recitation that she never received an offer to have the furniture returned is factual.

The Debtor also took every step possible to mitigate the damages associated with the spoiled groceries. When Willis told the Debtor to empty the contents of the Refrigerator, she

---

[30] $1,500.00 + $243.93 + $300.00 + $31,167.85 = $33,211.78.

[31] 1 Test. of Willis at 11:29:15 – 11:29:40.

[32] 1 Test. of Debtor at 3:13:46 – 3:14:41.

placed as many of the groceries as possible into a deep freezer to preserve them. She then purchased multiple bags of ice in an attempt to salvage the groceries that would not fit inside the deep freezer. Further, the Debtor only requested damages relating to the groceries that she could not salvage.

At Trial, Home Zone put forth evidence and argued at great length that Woods did not mitigate his fees because he did not progress settlement discussions in a timely manner. The Court finds this argument to be unfounded. It took both parties almost an identical amount of time to respond completely to discovery. Further, the correspondence submitted by Home Zone at Trial evidences the Debtor's multiple efforts to reach a settlement with Home Zone prior to Trial, including a settlement offer as early as April 2013. (*See* Home Zone Exs. 11 & 12). In addition, the Court took all admitted evidence into consideration when it evaluated the reasonableness of Woods's fees in the Opinion. In sum, the Court finds the Debtor could not have taken any additional steps to mitigate her actual damages.

### 3.    Punitive Damages

Punitive damages may be awarded for a willful violation of the automatic stay under § 362(k) in "appropriate circumstances." The Fifth Circuit has held that an "egregious conduct" standard applies in considering an award of punitive damages.  *Repine*, 536 F.3d at 521, *citing Knaus v. Concordia Lumber Co., Inc. (In re Knaus)*, 889 F.2d 773, 776 (8th Cir. 1989). In consideration of all the circumstances, the Court finds that Home Zone's conduct rises to the level of "egregious conduct" that warrants an award of punitive damages.

On September 1, 2012, the Debtor told Wright, a Home Zone employee, that she had filed bankruptcy. She gave Wright her attorney's business card and told him to contact her attorney if he had any questions. Wright communicated this information to Willis. Despite this

information, Willis and other Home Zone employees chose not to call the number on the business card, but instead chose to continue making phone calls to the Debtor about her delinquent account. In addition, Willis visited the Debtor's home and arranged for the Bedroom Set and Refrigerator to be repossessed. While the collateral was being loaded onto a Home Zone truck, Willis spoke to Woods, who provided Willis with additional information regarding the Debtor's pending bankruptcy. Despite this conversation, the Home Zone employees continued to load the collateral onto the truck and haul it away. Once Willis arrived back at the Home Zone store, he viewed a facsimile that had been sent by Bond Botes & Woods again providing information regarding the Debtor's bankruptcy. Willis testified that he was skeptical about the validity of the Debtor's bankruptcy filing, yet he never made any effort to contact the Clerk of this Court to verify the information he received.

Home Zone's actions, specifically those of Willis, clearly constitute egregious behavior that cannot be tolerated nor excused. Its conduct demonstrates a blatant and willful disregard for the bankruptcy process and the protections afforded to debtors via the automatic stay. Willis testified that prior to the repossession, Home Zone had a conference call in which Willis was told that he needed to "clear" delinquent accounts or "pretty much do something different in life."[33] Willis stated that the opportunity to "clear some of these customers" was why he went to the Debtor's residence on September 4, 2012.[34] McPhearson testified that it is Home Zone's official policy to stop contacting customers after receiving notice of a bankruptcy filing,[35] but Willis's testimony and actions make the Court question the effectiveness of Home Zone's efforts or the

---

[33] 1 Test. of Willis at 11:21:39 – 11:21:57.

[34] *Id.* at 11:21:58 – 11:22:18.

[35] 2. Test. of McPhearson at 10:38:40 – 10:39:12

procedures it has in place to ensure its employees are complying with bankruptcy law when interacting with clients. The pressure to "clear" accounts apparently outweighs any safeguards Home Zone has in place to ensure compliance with bankruptcy law. McPhearson stressed his unfamiliarity with the judicial process and his lack of experience in litigation. The purposes and significance of the automatic stay, however, are too great to recognize a defense or excuse based on ignorance. *See Collier*, 410 B.R. at 479. The Court finds that Home Zone's repeated efforts to collect a debt from the Debtor despite its knowledge of her bankruptcy filing reflects an arrogant defiance of the bankruptcy stay and constitutes egregious conduct warranting a punitive damage award for the Debtor in the amount of $2,500.00.

## Conclusion

Based on the foregoing, the Court concludes that the Debtor has successfully demonstrated that Home Zone willfully violated the automatic stay. The Court further finds that the Debtor is entitled to damages in the amount of $35,711.78. A final judgment consistent with this Opinion will be entered in accordance with FED. R. BANKR. P. 7054 and 7058.

SO ORDERED.

Neil P. Olack
United States Bankruptcy Judge
Dated:  December 19, 2013